IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

HOPE HUERTA as Next Friend and Parent
of BLANCA M. VALDEZ-HUERTA, a
minor,

    Plaintiffs,

vs.                                                                                                          Civ. No. 09-485 RHS/LFG

BIOSCRIP PHARMACY SERVICES, INC.,
and DOES 1-25,

    Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant BioScrip Pharmacy Services Inc.'s *Daubert Motion to Exclude the Proposed Expert Opinion Testimony of Randall L. Tackett, Ph.D.*, filed May 12, 2010 [Doc. 174]. The parties have not requested a hearing. Having considered the parties' submissions and the relevant law, the Court concludes that the motion should be granted as set forth below.[1]

    **I.**    **Legal Standards.**

Under Federal Rule of Civil Procedure 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The "overarching subject [of an inquiry under Rule 702] is the scientific validity—and thus the

---

[1] Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. *See* Docs. 8, 25.

evidentiary relevance and reliability—of the principles that underlie a proposed submission."

*Daubert v. Merrill Dow Pharm.*, 509 U.S. 590, 594 (1993)

> . . . . The subject of an expert's testimony must be "scientific [, technical, or other specialized] knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. . . . Instead, it represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement" (emphasis in original)). But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation- *i.e.*, "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.
>
> \* \* \* \*
>
> . . . .[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. *See* Rules 702 and 703. Presumably, this relaxation of the usual requirement of firsthand knowledge-a rule which represents "a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information,' " Advisory Committee's Notes on Fed. Rule Evid. 602, 28 U.S.C. App., p. 755 (citation omitted)-is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.
>
> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589-93 (1993) (footnotes omitted). Thus, "[a]n expert, no matter how good his credentials, is not permitted to speculate." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000). "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the

expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). "The objective of [*Daubert's* gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

## II. Background facts.

In 2003, seven-year-old Blanca Valdez-Huerta received a kidney transplant. Thereafter, she took numerous medications, including tacrolimus and Cellcept, to suppress her immune system and help prevent rejection of the implant. In the spring of 2006, BioScrip compounded from capsules, and dispensed as a liquid suspension, the prescribed tacrolimus that Blanca orally ingested. It is undisputed that, in 2006, BioScrip used a capsulated form of tacrolimus manufactured and distributed by Astellas Pharma U.S. Inc. ("Astellas") to compound its tacrolimus suspension. The Plaintiffs voluntarily dismissed Astellas as a Defendant because there was no evidence that the tacrolimus Astellas manufactured and supplied to BioScrip was subpotent or had been the subject of any recall. *See* Doc. 39. And the Plaintiffs have produced no direct evidence, from testing the suspension Blanca ingested or examining the compounding records, for example, that BioScrips' April or May 2006 formulations were, in fact, subpotent or improperly compounded.

Blanca was hospitalized in February 2006 after a "series of pneumonias that didn't clear with antibiotics." Doc. 175, Ex. B at 6. On March 8, 2006, Dr. John Brandt and other treating nephrologists substituted Imuran for the Cellcept. *See id.* at 5. Blanca had been taking Cellcept since the implant, but her doctors took her off of it because they thought the Cellcept was "oversuppressing [production] of white blood cells . . . that may have led to an increased risk of infection." Doc. 201, Ex. 3 at 3 (Dr. John Brandt's Depo.); Doc. 175, Ex. C at 12 (Dr. Alexander's

3

deposition, stating that a "low white blood cell count . . . [is] the most common side effect of CellCept."). Imuran is also an immunosuppressant that "suppresses the immune system less" than Cellcept. Doc. 181, Ex. 2 at 6  (Dr. Wong's Depo.). 2, 4-5.  Dr. Steven Alexander, another of Blanca's treating nephrologists testified that, "if Imuran is inadequate in combination with the [tacrolimus] to prevent rejection, then you could see rejection from a change from [tacrolimus]/Cellcept to [tacrolimus]/Imuran."   Doc. 175, Ex. C at 9.

In May 2006 Blanca experienced a severe and acute rejection of her transplanted kidney[2]. When she was admitted to the hospital the afternoon of May 15, 2006, Blanca's creatinine levels were 9, up from only .6 a month before.  *See* Doc. 175, Ex. C. at 8; Doc. 181, Ex. 2 at 3.  She had been vomiting "one to two times per night" for three nights before her admission on the afternoon of May 15, and she continued to vomit through May 16.  *See* Doc. 175, Ex. B at 5-6.  There was no way to know what Blanca's tacrolimus levels were on May 15 because no "level was drawn on that day."  *Id.* at 6.  Dr. Brandt reduced Blanca's prescription of tacrolimus on May 15 because he was concerned that she might have too much tacrolimus in her system.  *See id.*  On May 17, 2006, laboratory reports showed a tacrolimus level of 2.5 in Blanca's system.  *See* Doc. 198, Ex. A at 2.  No laboratory testing of Blanca's tacrolimus levels had been performed before May 15 except for her monthly testing on April 12, which was apparently normal at 5.4.  *See id.*

Dr. Wong described Blanca's rejection as a "catastrophe," usually seen when there is *no* immunosuppression, and he testified that "not getting any immunosuppresion" could include "not taking" the immunosuppressant medications; "taking it and not having the proper drug," as when the child is getting someone else's prescription by mistake; and "discontinuation of medications."

---

[2] Blanca partially recovered from this rejection, but suffered another acute rejection in 2007 and had to undergo a second transplant.

Doc. 198, Ex. A at 3-4.  Dr. Wong testified that teenagers who are noncompliant with taking their immunosuppressant medications even 10-25% of the time can still "kind of manage to do okay." Doc. 181, Ex. 2 at 3.  Dr. Wong stated that he had "hardly seen any severe acute rejections except for the cellular ones where the teens stopped taking their medicines . . . for like a month."  Doc. 175, Ex. A at 7.  He testified that, based on the severity of Blanca's rejection, he believed that "something went terribly wrong with her immunosuppressant medication."  *See id.* at 10.

Dr. Wong testified that Blanca's high creatinine levels on May 15, 2006 could be due to a "number of possibilities," including "rejection, . . . obstruction of the kidney, . . . return of old kidney disease into the transplant or plain inadequate blood flow to the kidney . . . [from] dehydration or clots."  *Id.*  But Blanca had no obstruction and had "a good blood flow to her kidney," and she had been doing well for a long time before the rejection, so he deduced that there was "some type of catastrophe with her immunosuppression."  Doc. 181, Ex. 2 at 3.

The basis of the Plaintiffs' lawsuit is that, as a result of Blanca's ingestion of BioScrip's allegedly subpotent tacrolimus, she rejected her transplanted kidney in May 2006.

**III.**.   **Dr. Tackett's testimony**.

Dr. Tackett is a  pharmaceutical expert with Ph.D. degrees in pharmacology and toxicology. *See* Doc. 174, Ex. A at 3.  In seeking his expert-witness services in October 2006, *see* Doc. 186, Ex. 1 at 2, the Plaintiffs asked Dr. Tackett whether the tacrolimus BioScrip dispensed to Blanca "was a contaminated drug or was there something wrong with the drug."  Doc. 174, Ex. A at 2.  In answering such a question, Dr. Tackett normally looks at "the properties of the drug," "the disease state," "how the drug was administered," and "the form in which the drug was administered."  *Id.*

He was also asked to give an opinion on what could cause a low tacrolimus value.  *Id.* at 4. To answer that question, he looks at "how the drug acts;" whether there is "a mechanism problem

5

that may be involved" or "a problem with either metabolism or excretion of the drug;" "the concept of compliance;" and "the dosage form . . . and how it was administered." *Id.*

Dr. Tackett has neither seen nor done any testing of the suspension that BioScrip dispensed to Blanca. *See id.* at 3, 7. He looked only at "photographs" of the bottles containing Blanca's tacrolimus. *Id.* at 3. Therefore, he was unable to examine the properties of the drug. *See id.* at 2. He stated that, although BioScrip "kept minimal documentation of calculations," *id.* at 4, the compounding for Blanca's medication was "pretty straightforward" and he could see no errors in the calculations BioScrip used to compound Blanca's medication. *Id.* at 5. He stated, however, that he saw "a lot of sloppy record-keeping." *Id.* at 5. This criticism was based, in part, on difficulty a former employee had, at his deposition, in "follow[ing] batch numbers;" on finding "a quality assurance that's not signed off on;" and "dates that are not complete" on some of the pharmaceutical records. *Id.* at 6.

Like her medical doctors, Dr. Tackett did not know what Blanca's tacrolimus levels were on May 15, 2006, but he "assum[ed] that her tacrolimus level had started to drop . . . on or right before May 15." *Id.* at 9. Based on the May 17, 2006 bloodwork, Dr. Tackett knew that Blanca's tacrolimus levels on May 17 were "significantly lower than 5 ng/ml just prior to the rejection of her kidney in 2006," *id.* at 4, 7. Dr. Tackett used a "rule-out," or differential-diagnosis[3], methodology

---

3

"'Differential diagnosis' refers to the process by which a physician 'rules in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains. The remaining cause is the expert's conclusion." *Hollander* [*v. Sandoz Pharm. Corp.*], 289 F.3d [1193], 1209 [(10th Cir. 2002)],(citation and quotation omitted). We have emphasized that the remaining cause must have been "ruled in" as scientifically plausible based upon reliable evidence. *See id.* at 1211. And this court has recognized that deficiencies in a particular differential diagnosis can support a

to explain whether there was something wrong with BioScrip's suspension that Blanca took in May 2006 that caused her renal failure - *i.e.* "could it be the drug or [] could it be something else." Doc. 186, Ex. 2 at 2, 4. He saw no potential drug interactions between Blanca's prescriptions that could have caused a problem with the tacrolimus, and ruled that out. *See id.* at 3, 8.

Critically, however, in arriving at his opinions, Dr. Tackett "assum[ed] that Blanca's compounded tacrolimus was compounded incorrectly," and "that Blanca's mother [and other family members responsible for dosing Blanca] was compliant with dosing her medication," even though he had never spoken with Blanca's family and, therefore, had no idea who was dosing Blanca, or what information they had been given regarding the necessity of shaking the suspension, using a proper measuring device, and carefully keeping a 12-hour schedule. Doc. 174, Ex. A at 7-8; Doc. 186, Ex. 2 at 7 (stating that he based his belief that Blanca's family had been compliant on Blanca's attorneys telling him "they didn't see it to be any problem;" "Dr. Wong's deposition . . . supported that;" that Blanca "seemed to be compliant" during the previous two years of being on the drug, and nothing in the medical records stated that Blanca's family "forgot to give her the medecine"); *see* Doc. 175, Ex. A at 5 (Dr. Wong's testimony that "not taking the right dosage at the right time [can] affect absorption of tacrolimus and blood levels," and that "not [being] precise about the liquid" being administered, like, for example using a kitchen teaspoon instead of a medical syringe, can "lead to variations"); Doc. 175, Ex. C at 13 (Dr. Alexander's testimony that, if the person

---

district court's decision to exclude expert testimony. *See id.* at 1212.

*Ronwin v. Bayer Corp.*, No. 08-8089, 332 Fed. Appx. 508, 514, n.6, 2009 WL 1678198, 5 (10th Cir. June 17, 2009); *see Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 998 (10th Cir. 2003) (stating, "a reliable differential diagnosis is admissible in this circuit given a valid showing of general causation").

administering tacrolimus suspension fails to shake the bottle before measuring out the dose, "you can have low [tacrolimus] concentrations in the liquid that you start the month out with").

Dr. Tackett also assumed that Blanca's vomiting before her tacrolimus blood level was checked on May 17 "did not interfere with her absorption of the tacrolimus." Doc 174, Ex. A at 9. He based this opinion on his mistaken belief that Blanca had vomited only once an evening over a period of three days and was therefore "not excessive", *see* Doc. 186, Ex. 2 at 5, instead of one to two times a night for a period of 5 days before her tacrolimus blood levels were taken. *See* Doc. 175, Ex. B at 5-6 (Dr. Wong's testimony, based on reading the medical records, that Blanca been vomiting "one to two times per night" for three nights before her admission on the afternoon of May 15, and that she continued to vomit through May 16). There is apparently no evidence in the record to show what time of day and evening Blanca actually received her two daily doses of tacrolimus that were to be given 12 hours apart, or what time she vomited after receiving the medication, thus Dr. Tackett made an assumption that the vomiting did not affect her tacrolimus absorption based on no known facts. *See* Doc. 186, Ex. 2 at 5 (Dr. Tackett stating that he did not see "in the records" whether Blanca's vomiting was occurring right after she took her medicine).

Dr. Tackett stated that the change from CellCept to Imuran "would have minimal" impact on Blanca's rejection, Doc. 174, Ex. A at 8. He based this opinion on his belief that, if there was "one [immunosuppressant] on board and the other one failed," he would not expect "for the creatinine levels to go" as high as Blanca's did. Doc. 186, Ex. 2 at 6. He thought that if the Imuran had failed, he would have seen a more "gradual effect." *Id.* at 8. The problem with this testimony, of course, is that there was no testing on Blanca's creatinine levels from April 12 until over a month later, on May 15, so there are no facts to show when the creatinine levels started increasing or what kind of increase – rapid spike or gradual – Blanca actually experienced.

8

Based on his experience, Dr. Tackett testified that compounding errors involving capsules, as opposed to powders, most often occur in "miscounting" the capsules. Doc. 174, Ex. A at 5. And based on that knowledge, and on his experience that "poor record-keeping . . . reflects poor laboratory procedures and skills," *id.* at 7-8, Dr. Tackett testified that his "guess" was that, when BioScrip pharmacists were compounding the April or May 2006 suspension, either "the wrong number of capsules were counted out or emptied improperly," *id.* at 5.

Dr. Tackett stated that, because he had "ruled out" other causes of low tacrolimus levels, including the possibility of noncompliance with medication dosing, and saw that BioScrip's documentation "suggested sloppy work," *id.* at 8, so that he could not "rule[] out completely . . . the compounding issue," Doc. 186, Ex. 2 at 9, his opinion at trial is expected to be that "reduced levels of tacrolimus resulted in Blanca's kidney rejection and it was caused by a compounding error," Doc. 174, Ex. A at 4.

BioScrip contends that, because he is not a pharmacist, has never kept pharmacy or compounding records, and has no knowledge regarding what the state board of pharmacy requires with regard to pharmaceutical record keeping, he is not "qualified to testify as to BioScrip's record-keeping practices." Doc. 174 at 2, 4. BioScrip further argues that, because he is not a "medical expert qualified to opine as to what caused Blanca's kidney rejection, his opinion testimony will not assist the trier of fact" and is inadmissible. Doc. 174 at 2.

In rebutting BioScrip's arguments, the Court notes that the Plaintiffs have generally alluded to "proof" of Dr. Tackett's qualifications in his *Curriculum Vitae*, but the citations to that 44-page document do not identify where that proof may be found, and the Court will not search the document. *See, e.g.*, Doc. 186 at 3 (alluding to alleged facts that Dr. Tackett "has testified in cases similar to this one and has *never* been precluded from testifying;" and that he "has been retained and

9

was in a quality control position, in which he and two others were retained to evaluate a pharmaceutical company's quality assurance program, which includ[ed] the company's record-keeping process" by pointing only to the *Curriculum Vitae* and citing no page numbers); D.N.M. LR-Civ. 56.1(b) (requiring the parties "to refer with particularity to those portions of the record upon which" they rely).

The Court agrees with the Plaintiffs that the record-keeping flaws that Dr. Tackett decries as "sloppy" are identifiable by a layman, thus an expert is not necessary in identifying the flaws. *See* Doc. 186 at 3. And the Plaintiffs have shown that Dr. Tackett has trained pharmacists for over 20 years in pharmacology, pharmaceutics, and pharmakinetics, and has taught pharmaceutical compounding. *See* Doc. 186, Ex. 2 at 3-4. The Court concludes that a layman would not necessarily connect sloppy pharmaceutical record-keeping with sloppy compounding, and that Dr. Tackett is qualified to testify as to the relationship between the two situations that he has experienced as a researcher and pharmacy instructor. He also is qualified to testify regarding the most common type of compounding errors when using capsules as an ingredient in the compound. And he is qualified to testify that BioScrip's compounding calculations were correct and that the compounding task it was given was straightforward instead of complicated.

Because he is not familiar with the standards of record-keeping the State Board of Pharmacy imposes on pharmacies, however, Dr. Tackett may not testify regarding that issue.

The issue of causation for the low levels of tacrolimus Blanca undisputedly experienced on May 17, 2006 – and apparently before – is much more troublesome. Dr. Tackett based his assumption that the tacrolimus was subpotent or improperly compounded in part on Dr. Wong's notations in the medical record and his deposition. As the Court previously has concluded however,

Dr. Wong's and Dr. Alexander's factual assumption, *based on the recall*, that

> BioScrip's tacrolimus suspension was subpotent or inadequate was totally erroneous because BioScrip's suspension was not compounded from the recalled tacrolimus powder. As mentioned, *supra*, there is no direct evidence to show that BioScrip's suspension was subpotent or inadequate in any way, although it would have been easy enough for the doctors or the Plaintiffs to have tested it.
>
> An opinion that is derived from erroneous facts or assumptions is not reliable because it is not "supported by appropriate validation-*i.e*., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590; *see* FED. R. EVID. 702 (requiring expert testimony to be based on "sufficient facts or data" and the "product of reliable principles and methods"); *cf. Orth v. Emerson Elec. Co., White-Rodgers Div.*, 980 F.2d 632, 637 (10th Cir. 1992) (affirming court's decision to admit testimony that "served to 'connect up' the direct evidence" and noting that an expert may make assumptions if they are based on "known facts, together with his experience and knowledge of causation factors, and drawing a rational conclusion as to causation"). Neither Dr. Wong's nor Dr. Alexander's opinions purporting to place the cause of Blanca's insufficient immunosuppression in May 2006 on subpotent or inadequate tacrolimus suspension is reliable because each is based on an erroneous assumption and is not based on any known facts.

Doc. 224 at 10-11. Further, Dr. Tackett's ruling-out of the issue of noncompliance was not based on known facts or other "good grounds," but rather on an assumption, based in part on the Plaintiffs' attorneys' statements and Dr. Wong's belief, that the family had been compliant and no statements in the medical records that family members told the treating physicians they were not compliant. Dr. Tackett did not further investigate this assumption. And although Dr. Tackett stated he saw that, in May 2007, "there was a concern about compliance . . . when [Blanca] again presented to the hospital . . . with an undetectable level of tacrolimus in her system,"[4] he dodged the issue by stating only that "her overall pattern of what she has been taking did not indicate that compliance was a problem." Doc. 186, Ex. 2 at 7. He did not explain why he completely ruled out noncompliance in May 2006 and blamed low tacrolimus levels on faulty medication when exactly the same thing

---

[4] Dr. Wong testified that, in May 2007, Blanca's medical records showed that "she had undetectable levels" of tacrolimus and that the doctors were concerned "that her mother wasn't dosing her properly." Doc. 181, Ex. 2 at 3.

11

happened a year later while Blanca was taking a different form of tacrolimus and the low tacrolimus level was remedied simply by having hospital employees administer the medication instead of Blanca's family.[5]  The Court concludes that Dr. Tackett's attempt to make a differential diagnosis of causation that "rules out" noncompliance based on untested assumptions and hearsay, which the Plaintiffs' own medical experts both agreed is the most common cause of transplant rejections as severe as Blanca's, and "rules in" faulty medication as the cause of the rejection based only on sloppy record-keeping, falls far short of *Daubert's* requirement that an expert base his opinion on actual scientific knowledge, instead of "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  "Under *Daubert*, 'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).  Dr. Tackett's faulty differential diagnosis is simply too unreliable to render admissible his testimony regarding ultimate causation.

The Court further notes that Dr. Tackett's "guess" that the pharmacist who compounded Blanca's tacrolimus prescription most likely miscounted or failed to fully empty some of the capsules, thereby causing the rejection, is totally inconsistent with the treating physicians' opinions that Blanca's catastrophic rejection could only have been caused by a lack of immunosuppressants on a level with not taking *any* immunosuppressants for a period of time or having been given the wrong medication.  As noted above, according to Dr. Wong, teens he had treated missed up to 25%

---

[5] According to the medical records, in May 2007 Dr. Brandt reported: "In the past 2 weeks Blanca has had difficulty with achieving adequate blood levels of Rapamycin and [tacrolimus]. During this time multiple family members have been responsible for medication administration and we suspect this has been inadequate.  Here in the hospital on her standard medication doses, her [tacrolimus] level was most recently 8.7 and a Rapamycin level 5.8."  Doc. 175, Ex. D at 6.

of their immunosuppressant medication without suffering a rejection, and Blanca's rejection was matched only by his patients who failed to take their immunosuppressants for a month or so. Dr. Tackett did not speculate that the compounding pharmacist had completely failed to put *any* tacrolimus into the suspension through miscounting or not fully emptying the capsules. Dr. Tackett's speculations regarding ultimate causation would do nothing but confuse a jury. As Dr. Wong stated, something went "terribly wrong" with Blanca's immunosuppressant levels. But, as he noted, without evidence to support either that the tacrolimus suspension was subpotent or that Blanca was nonadherent in taking her medication, "we just know that the rejection happened. . . . .[W]e can guess for a long time what might have caused it." Doc. 203, Ex. 1 at 10. The Court will not allow Dr. Tackett to submit to the jury his "guess" about what caused it.

**IT IS ORDERED** that BioScrip's *Daubert Motion to Exclude the Proposed Expert Opinion Testimony of Randall L. Tackett, Ph.D.* [Doc. 174] is GRANTED as set forth above, and Dr. Tackett shall not be permitted to testify regarding the standard of care for keeping pharmacy records; about the actual potency or adequacy of the tacrolimus suspension BioScrip dispensed; or that a subpotency or inadequacy of BioScrip's tacrolimus suspension either caused low levels of tacrolimus in Blanca's system or was a cause of Blanca's transplant rejection.

                                                                */s/ Robert Hayes Scott*
                                                     ROBERT HAYES SCOTT
                                                     UNITED STATES MAGISTRATE JUDGE
                                                     Presiding by Consent